**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No.  06-cv-00928-REB

KERRY COURNOYER,

     Petitioner,

v.

JOE ORTIZ, Executive Director of the Colorado Department of Corrections, and
JOHN SUTHERS, The Attorney General of the State of Colorado,

     Respondents.

---

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

---

**Blackburn, J.**

     This matter is before me on the petitioner's **Petition for Writ of Habeas Corpus Pursuant To 28 U.S.C. § 2254** [#1][1] filed May 18, 2006.  The respondents filed an answer [#12], and the petitioner filed a reply [#15].  I have reviewed carefully the parties' filings and exhibits.  Ultimately, I conclude that the petitioner is not entitled to the relief he seeks, and I dismiss the petition.[2]  The parties' briefs demonstrate that there is no dispute about the testimony contained in the state court record, and I rely on the parties' citations to the state court record.  My citations to the state court record are by volume and page number, *e.g.*, v. 8, p. 38.

---

[1]   "[#1]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

[2]   I note that 28 U.S.C. § 2254 speaks of "an application for a writ of habeas corpus."  In this case, the applicant has adopted the term petition and petitioner rather than application and applicant.  Thus, I will use the terms petition and petitioner in this order.

## I.  JURISDICTION

I have jurisdiction over this matter under 28 U.S.C. § 2254(a).

## II.  FACTS

### A.  Trial Evidence

On October 23, 1998, a jury convicted the petitioner, Kerry Cournoyer, of two counts each of felony murder, aggravated robbery, and conspiracy to commit aggravated robbery.  Cournoyer's convictions are based on a double homicide involving a group of friends who were involved with drug use and drug trafficking.  According to the prosecution, the group of friends included Thomas Behymer, John Curren, Daniel Sullivan, Monir Wood, and Cournoyer.  The victims, Raul Palma and Leo Hartnett, were murdered on May 26, 1997.

Curren owed Palma thirty to thirty-five thousand dollars as a result of a previous aborted drug transaction in which a vehicle driven by Curren, which was full or maijuana belonging to Palma, was seized by the police.  According to Curren, Palma had threatened Curren's life, and shortly before the murders, Palma brought Hartnett to Colorado so Hartnett could kill Curren.  According to Cournoyer, Behymer, Sullivan, and Curren devised a plan to lure Palma and Hartnett to a friend's house so Palma and Hartnett could be robbed of their drugs and money and then killed.  This would solve Curren's conflict with Palma.

According to testimony at Cournoyer's trial, the victims, Palma and Hartnett, were lured to the home of Kelly Callaway.  Callaway testified at trial that she had agreed to allow four of her friends, Curren, Behymer, Wood, and Cournoyer, to use her house to transact a drug deal on May 26, 1997.  v. 8, pp. 38, 276 - 281.  Curren gave Callaway fifty dollars to go shopping while the drug deal was completed.  v. 8, p. 43.  Callaway testified that

Cournoyer and Wood were standing in her kitchen armed with guns when she left her house to go shopping on May 26, 1997.  v. 8, p. 61.  When she returned to her house later the same day, Callaway found a very large hole in one of the walls of her house and some small blood stains on her bedroom wall. v. 8, pp. 40-49. Her bed, bed coverings, and bedroom carpet were missing.  *Id*.  Callaway testified that Curren, Behymer, Wood, and Cournoyer all contributed money for repairs to her house and told her that they would fix everything.  v. 8, pp. 46-47, 50-53.  According to Callaway, all four men returned to her house the following day to finish cleaning the house.  v. 8, pp. 53-54.  Callaway testified also that Cournoyer told her in September, 1997, that Cournoyer had struck Hartnett in the head with the butt of a shotgun, and that he had "jumped on a guy's rib cage," bragging that his "feet were a lethal weapon."  v. 8, p. 61.

Sullivan testified that he had worked for Palma transporting drugs for Palma's drug operation.  Sullivan testified that he participated in the scheme to lure Palma and Hartnett to Callaway's house by driving a car containing marijuana to Callaway's house as Harntett followed in a separate car.  When he arrived at Callaway's house, Sullivan observed Curren, Wood, and Cournoyer armed with shotguns in the kitchen.  v. 7, pp. 68, 71.  As Sullivan began to leave the house, he saw the four men, Curren, Behymer, Wood, and Cournoyer, charge Hartnett and violently shove him against the wall.  v. 7, pp. 68 -73.  The men pinned Hartnett's hands behind his back and proceeded to handcuff or duct tape them.  v. 7, p. 72.  Sullivan testified also that Cournoyer helped to clean Callaway's house after the murders, and that Cournoyer permitted the temporary storage of the two corpses in a truck owned by Cournoyer.  v. 14, pp. 63 - 85, 102 -103, 228, 238, 246; v. 15, 51, 61 - 63.

Behymer also testified against Cournoyer.  Behymer's testimony came shortly after

Behymer had been acquitted at his own trial concerning the murders of Palma and Hartnett.  The specific details of Behymer's testimony are not described in the parties' briefs.  However, Cournoyer says the prosecution "bolstered the Sullivan testimony with the stories of Kelly Callaway and with Tom Behymer . . . ."  *Petition*, p. 13.  In short, Cournoyer says Behymer's testimony was consistent with that of Callaway and Sullivan because Behymer implicated Cournoyer in the murders.

Kara Erickson testified that she was friends with Callaway and that she knew Sullivan, Curren, Behymer, Wood, and Cournoyer. v. 8, pp. 134 -135.  Erickson said she went to Callaway's house for lunch, as she often did, on May 27, 1997, the day after the murders.  v. 8, pp. 137, 144.  She said Cournoyer, Wood, Sullivan, and Curren all were at the house when she arrived.  v. 8, pp. 137 - 138.  Erickson observed a large hole in the wall of Callaway's house, between the bedroom and bathroom doors, but no one explained the hole to her.  v. 8, p. 138.  No one spoke to Erickson during her visit except for Callaway, who asked Erickson to leave after 15 minutes.  v. 8, pp. 138, 144.  Erickson said this was unusual because she usually would spend her entire lunch hour at Callaway's house.  v. 8, p. 144.

### B.  Post-Trial Proceedings and Appeals

Following Cournoyer's convictions, Cournoyer discovered five witnesses who said they had heard statements by Sullivan, Behymer, and Curren indicating that Cournoyer had not been involved in the murders and that Sullivan and Behymer had testified falsely at Cournoyer's trial when they implicated Cournoyer in the murders.  One witness, Jimmy Russell, was presented in support of Cournoyer's motion for a new trial.  The other four witnesses were discovered while Cournoyer's petition for writ of certiorari in his direct appeal was pending before the Colorado Supreme Court.  I describe below the testimony

of each of these five witnesses and the post-trial proceedings and appeals in Cournoyer's case.

**Jimmy Russell** - Cournoyer met Jimmy Russell when they both were housed in the Adams County Jail in February, 2000, over a year after Cournoyer's convictions. Russell told Cournoyer that Russell had met Sullivan while Russell and Sullivan were in a holding cell in December, 1997. According to Russell, Sullivan told Russell that Sullivan had falsely implicated Cournoyer in Sullivan's statement to the police concerning the murders. Sullivan said he implicated Cournoyer in an effort to make his, Sullivan's, story consistent with the story Callaway had told the police previously. Russell said Sullivan's rationale for implicating Cournoyer was to protect Callaway, who had a small child and who otherwise would be shown to have lied to the police about Cournoyer's involvement. Some evidence demonstrated that Sullivan and Callaway were involved romantically at the time of the murders. Russell said also that Sullivan tried to bribe Russell to get Russell to claim falsely that Cournoyer had confessed to Russell that Cournoyer was involved in the murders.

On April 11, 2000, Cournoyer presented Russell's testimony at a hearing on Cournoyer's motion for new trial. Russell said he had been in the same jail pod as Cournoyer for about 25 days, but he did not tell Cournoyer about Sullivan's statements because Russell did not want to get involved or to be labeled a snitch. *Petition*, Exhibit B, p. 1 (trial court's May 4, 2000, order). Russell acknowledged that he has several felony convictions. *Id.* On May 4, 2000, the trial court denied Cournoyer's motion for new trial, applying the Colorado standard for such motions, as stated in the court's May 4, 2000, order. Id., pp. 2 - 3. Addressing Russell's testimony, the trial court concluded that Russell's testimony,

is not material to the issues involved and is more appropriately characterized as impeachment evidence.  At trial, Sullivan testified that the defendant was present and was armed during the robbery of the victim, Leo Hartnett. Sullivan offered little else in terms of defendant's criminal involvement in the commission of the offenses.  Given this context . . . the information is not offered as a fact of consequence, but as information to challenge the credibility of Sullivan.  As such, and given the credibility problems Russell would present with, this Court finds it extremely unlikely that a reasonable jury would acquit the defendant if evidence of Sullivan's alleged statements to Russell were presented at trial.

*Id.*, p. 2.

Cournoyer then filed a direct appeal of his conviction.  The Colorado Court of Appeals upheld Cournoyer's conviction.  ***People v. Cournoyer***, No. 99CA832 (Colo. App. March 22, 2001) (not selected for publication) (*Response* [#12], Appendix D).  Cournoyer filed a petition for certiorari with the Colorado Supreme Court.  While his petition for certiorari was pending, Cournoyer's counsel discovered four new witnesses whose testimony indicated that Behymer and Curren, and arguably others, falsely had implicated Cournoyer.  Cournoyer then filed two motions for limited remand with the Colorado Supreme Court, asking that he be permitted to present these four new witnesses in the trial court before his appeal was resolved.  The Colorado Supreme Court denied the motions for limited remand and denied Cournoyer's petition for certiorari.

Cournoyer then filed a motion for post-conviction relief under Rule 35(c) of the Colorado Rules of Criminal Procedure.  The motion was filed on February 12, 2002, and a supplement was filed on November 25, 2002.  In his Crim.P. 35(c) motion, Cournoyer argued that newly discovered evidence indicated that witnesses at Cournoyer's trial falsely had implicated Cournoyer in the murders.  Cournoyer said he first discovered this evidence while his petition for certiorari in his direct appeal was pending.  The newly discovered evidence consisted of statements by four witnesses, Christophe Clark, David Neese,

Heather Ellingson, and Scott Kramer.  Each of these witnesses said that they had been

told by Curren and/or Behymer that Cournoyer was not involved in the murders and that

Behymer had falsely implicated Cournoyer in Behymer's testimony at Cournoyer's trial.

The trial court held a hearing on Cournoyer's Crim.P. 35(c) motion on May 2, 2003.  Clark

Neese, Ellingson, and Kramer testified at the hearing.

**Christophe Clark** - At Cournoyer's Crim.P. 35(c) hearing, Christophe Clark testified

that he was Cournoyer's martial arts instructor and that he was acquainted with Curren as

one of Cournoyer's friends.  v. 14, pp. 8 - 9.  Clark testified that he considered Cournoyer

to be "like a little brother," and that their relationship was "very important" to him.  v. 14, pp.

26 - 27.  Clark testified that about a month before Cournoyer's trial, Curren told Clark that

neither Curren nor Cournoyer were involved with the murders.  v. 14, p. 10.  Clark said

Curren told him that Cournoyer had "nothing to do with it."  v. 14, pp. 12, 16, 19.

Addressing Curren's claim that Curren was not involved with the murders, Clark noted that

Curren "slipped up" when Curren told Clark about the use of duct tape in the killings.  v. 14,

p. 10.  Clark said that when Curren told Clark that Cournoyer was not involved, that was

"all he [Clark] cared about," and he did not ask further questions about Curren's duct tape

remark.  v. 14, p. 9.

**David Neese** - David Neese testified that after Cournoyer's convictions and

Behymer's acquittal, Behymer came to Neese's house.  Neese admitted to using

marijuana "every other day" at that time and he "was sure" that he had been using

marijuana on the day Behymer came to Neese's house.  v. 14, p. 28.  Neese testified that

Behymer told Neese that he, Behymer, "felt bad" because he had "put Kerry [Cournoyer]

away for the rest of his life just so [Behymer] could have his freedom."  v. 14, pp. 23 - 25.

Behymer added that he "couldn't believe how somebody who had nothing to do with it, like,

is the one who is in jail for the rest of his life now." v. 14, pp. 23 - 26.   Neese said he did

not come forward to report Behymer's statement about Cournoyer's purported innocence

because Neese did not want to get involved.  v. 14, pp. 29, 32.

**Heather Ellingson** - Heather Ellingson testified that on March 13, 2000, Behymer

told her that "[Cournoyer] didn't have anything to do with" the murders. v. 14, pp. 35 - 36,

40, 42.  Behymer said that, prior to Cournoyer's trial, he believed that Cournoyer would not

be convicted "since he [Behymer] knew that Kerry was not involved." v. 14, pp. 36 - 37,

41, 43.  Ellingson described further how Behymer told her that he had been encouraged by

family members and his lawyer to implicate Cournoyer, since others were doing so,

thinking "it would be easier just to go along with everybody else's story." v. 14, pp. 36 - 37.

Ellingson testified that she had known Cournoyer for eleven years. v. 14, p. 34.

**Scott Kramer** - Scott Kramer testified that he had employed Cournoyer briefly as a

physical laborer and that he was "a very good friend to [Cournoyer]." V. 14, pp. 45 - 46.

Kramer said he became acquainted with Curren and Behymer through Cournoyer.  v. 14,

pp. 46, 57, 60.  Kramer testified that during Behymer's trial, which preceded Cournoyer's

trial, Kramer overheard Curren and Behymer state that they were implicating Cournoyer

even though Cournoyer "had no involvement with it." v. 14, 48 - 49.  Kramer testified also

that in the spring and summer of 2000, Kramer "bumped into" Behymer on two different

occasions at a bar.  During these encounters, Kramer testified, Behymer explained to

Kramer that Cournoyer "had absolutely nothing to do with any part of the murders, that

Cournoyer was not even near the house when the murders took place, nor was

[Cournoyer] there afterwards." v. 14, p. 63.  Kramer said he did not come forward with this

information before or during Cournoyer's trial because he, Kramer, was "on probation." v.

14, p. 48.

After hearing the testimony of Clark, Neese, Ellingson, and Kramer, the trial court denied Cournoyer's motion for post-trial relief.  A transcript of the court's ruling from the bench at the conclusion of the Crim.P. 35(c) hearing is attached to the people's answer brief filed in Cournoyer's second appeal to the Colorado Court of Appeals.  *Response* [#12], Appendix G (answer brief - appeal of Rule 35(c) ruling), appendix to answer brief (partial transcript of May 2, 2003, Rule 35(c) hearing).  The trial court concluded that the testimony of all four witnesses was not credible and that Cournoyer had not established by a preponderance of the evidence that his convictions were obtained through perjured testimony.  *Id.*, pp. 108, 110.  Addressing the credibility of the four witnesses collectively, the trial court noted that all four of the witnesses had known Cournoyer for a significant period of time and they "care deeply about him."  *Id.*, p. 107.  The court noted also that "not a single one [of the four witnesses] came forward to help their friend whom they said they care deeply about at a time when" it would be reasonable for a caring friend "to have come forward with what would have been fairly compelling evidence showing nonguilt . . . ."  *Id.*, pp. 107 - 108.

The court then addressed individually the credibility of each witness.  The court noted that Clark glanced over at Cournoyer as Clark entered the courtroom and "it was clear to me they have a connection."  The court noted that Clark testified that he was most interested in hearing from Curren that Cournoyer was not involved with the murders, and that is all Clark wanted to hear.  *Id.*, p. 109.  The court found Clark not to be credible because he is a friend of Cournoyer's, and he did not come forward with evidence that would have been critical to Cournoyer had Curren actually told Clark that Cournoyer was not involved with the murders.  *Id.*

The court noted that Neese was also a friend of Cournoyer's, that Neese regularly

used marijuana around the time of his claimed conversation with Behymer, and that Neese

may have been under the influence of marijuana when he and Behymer had the

conversation described by Neese.  *Id.*

> [Neese] also is a friend of Mr. Cournoyer.  He didn't come forward with this
> critical information at the time when it would have been reasonable to expect
> someone, had this conversation occurred, to come forward and assist his
> friend.  I don't think this conversation happened.

*Id.*

Similarly, the court noted that Ellingson had been a friend of Cournoyer for ten or

eleven years.  She testified that Behymer told her that Cournoyer wasn't involved in the

murders in any way, but "she didn't come forward with that information.  I'm discounting

her testimony."  *Id.*, p. 110.  Finally, the court concluded that Kramer's testimony was not

credible for the same reasons.  "He's been acquainted with Mr. Cournoyer for a significant

period of time.  He indicates that he heard that the defendant was not involved and didn't

come forward with that evidence."  *Id.*

Ultimately, the court concluded that Cournoyer had not demonstrated by a

preponderance of the evidence that the conversations described by Clark, Neese,

Ellingson, and Kramer actually occurred.  *Id.*  Based on this conclusion, the court found

that Cournoyer had not shown that his conviction was obtained through perjured

testimony.  *Id.*  The court noted also, "(f)or the sake of discussion," that if the court had

found Clark, Neese, Ellingson, and Kramer to have been credible, then their testimony

fairly would be characterized as material and not merely impeachment.  *Id.*, p. 110 - 111.

Applying the standard of Crim.P. 35(c), the court concluded, however, that it would not be

reasonable to "expect that the jury would have found differently" had this testimony been

presented at trial along with the other evidence that was presented at trial.  *Id.*, p. 111 -

112.

Cournoyer appealed the trial court's ruling to the Colorado Court of Appeals.  The Court of Appeals affirmed the trial court.  **People v. Cournoyer**, No. 03CA1138 (Colo. App. February 17, 2005) (not selected for publication) (*Response* [#12], Appendix I).  The Colorado Supreme Court denied Cournoyer's petition for certiorari.  *Response*, Appendix J.

### III.  CLAIMS ASSERTED

In his petition, Cournoyer does not explicitly delineate separate claims.  I read his petition as stating two related claims.  First, Cournoyer asserts a claim that his convictions were obtained in violation of his rights under the Due Process Clauses of the Fifth and Fourteenth Amendments because perjured testimony was presented at his trial.  *Petition*, p. 16.  For the purpose of accurate analysis, I read the first claim as a challenge to the trial court's denial of Cournoyer's motion for new trial based on the testimony of Jimmy Russell. Russell is the jail inmate who testified that Sullivan told Russell that Sullivan planed to testify falsely that Cournoyer was involved in the murders.  Procedurally, this claim coincides with Cournoyer's motion for new trial and his direct appeal of his convictions.   I will refer to this claim as Claim One.

Second, Cournoyer argues that subsequent to his convictions, he acquired newly-discovered evidence that demonstrates that his convictions were obtained through perjured testimony in violation of his right to due process of law.  Apparently for reasons of habeas procedure, detailed below, Cournoyer claims this evidence shows that he is actually innocent.  He argues that the trial court abused its discretion when it concluded that the testimony of Clark, Neese, Ellingson, and Kramer, as presented at Cournoyer's Rule 35(c) hearing, was not credible.   I read this second assertion as a claim that

Cournoyer's right to due process of law was violated when the trial court concluded at the Crim.P. 35(c) hearing that these witnesses were not credible and that their testimony did not provide a basis for relief under Crim.P. 35(c). Procedurally, this claim coincides with Cournoyer's motion for relief under Crim.P. 35(c), and his appeal of the trial court's denial of relief under Crim.P. 35(c). I will refer to this claim as Claim Two.

## IV. TIMELINESS OF PETITION

I agree with the parties that Cournoyer's petition was filed within the applicable one year statute of limitations. 28 U.S.C. § 2244(d).

## V. EXHAUSTION OF STATE COURT REMEDIES & PROCEDURAL DEFAULT

### A. Applicable Standards

Generally, exhaustion of available and adequate state court remedies is a prerequisite to a habeas corpus petition in federal court. ***Granberry v. Greer***, 481 U.S. 129 (1987); ***Rose v. Lundy***, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b). State remedies are not deemed exhausted until the highest state appellate courts have had an opportunity to consider the merits of the claim that the petitioner seeks to present in federal court. ***See Pitchess v. Davis***, 421 U.S. 482 (1975). The exhaustion of state remedies requirement in federal habeas cases dictates that a state prisoner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." ***O'Sullivan v. Boerckel***, 526 U.S. 838, 845 (1999). The "substance of a federal habeas corpus claim" must have been presented to the state courts in order to satisfy the fair presentation requirement. ***Picard v. Connor***, 404 U.S. 270, 278 (1971); ***see also Nichols v. Sullivan***, 867 F.2d 1250, 1252 (10th Cir. 1989). Although fair presentation does not require a habeas corpus petitioner to cite "book

and verse on the federal constitution," *Picard*, 404 U.S. at 278 (internal quotation marks

omitted), "[i]t is not enough that all the facts necessary to support the federal claim were

before the state courts." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam).  Rather,

a claim must be presented as a federal constitutional claim in the state court proceedings

in order to satisfy the exhaustion requirement.  *See Duncan v. Henry*, 513 U.S. 364, 365-

66 (1995) (per curiam).

Generally, a federal court should dismiss unexhausted claims without prejudice so

that the petitioner can pursue available state-court remedies. *See Demarest v. Price*, 130

F.3d 922, 939 (10th Cir.1997).  If the state court to which a petitioner must present his

claims in order to meet the exhaustion requirement "now would find those claims

procedurally barred, there is a procedural default for the purposes of federal habeas

review." *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir.1992); *see also Bland v. Sirmons*,

459 F.3d 999, 1012 (10th Cir. 2006).

> In all cases in which a state prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state procedural rule, federal
> habeas review of the claims is barred unless the prisoner can demonstrate
> cause for the default and actual prejudice as a result of the alleged violation
> of federal law, or demonstrate that failure to consider the claims will result in
> a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B.  Cournoyer's Claims

### 1.  Claim One

In his direct appeal of his convictions to the Colorado Court of Appeals, Cournoyer's

opening brief cites federal constitutional law in support of his claim that the prosecution

offered perjured testimony at trial.  *Response* [#12], Appendix A (opening brief - direct

appeal), pp. 18 - 19.  As the respondents note, Cournoyer did not present this claim as a

federal constitutional claim in his petition for a writ of certiorari to the Colorado Supreme

Court.  *Response* [#12], Appendix K (petition for certiorari - direct appeal).  The

respondents argue that Cournoyer did not exhaust Claim One because he did not present

this claim to the Colorado Supreme Court as a federal constitutional claim.

Based on the recently enacted Colorado Appellate Rule 51.1, I conclude that

Cournoyer has exhausted his state remedies as to Claim One.  Rule 51.1, which became

effective on May 18, 2006, provides:

> (a) Exhaustion of Remedies. In all appeals from criminal convictions or
> post-conviction relief matters from or after July 1, 1974, a litigant shall not be
> required to petition for rehearing and certiorari following an adverse decision
> of the Court of Appeals in order to be deemed to have exhausted all
> available state remedies respecting a claim of error.  Rather, when a claim
> has been presented to the Court of Appeals or Supreme Court, and relief has
> been denied, the litigant shall be deemed to have exhausted all available
> state remedies.
>
> (b) Savings Clause. If a litigant's petition for federal habeas corpus is
> dismissed or denied for failure to exhaust state remedies based on a
> decision that this rule is ineffective, the litigant shall have 45 days from the
> date of such dismissal or denial within which to file a motion to recall the
> mandate together with a writ of certiorari presenting any claim of error not
> previously presented in reliance on this rule.

The respondents argue that Rule 51.1 does not affect the federal habeas

exhaustion requirement because a criminal defendant still may seek review by the

Colorado Supreme Court after Rule 51.1 became effective.  If review by the Colorado

Supreme Court is available to a criminal defendant, the respondents argue, then a

defendant must pursue such review to satisfy the requirement that a defendant "give the

state courts one full opportunity to resolve any constitutional issues by invoking one

complete round of the State's established appellate review process" before seeking federal

habeas relief.  **O'Sullivan v. Boerckel**, 526 U.S. 838, 845 (1999).

While the respondents' argument may have some facial appeal, I note that four

United States Courts of Appeals, applying *O'Sullivan*, have determined that state rules similar to Colo. App. R. 51.1 effectively eliminate the need to seek review in the state's highest court in order to satisfy the federal habeas exhaustion requirement.  *See Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004); *Adams v. Holland*, 330 F.3d 398, 401-03 (6th Cir. 2003); *Randolph v. Kemna*, 276 F.3d 401, 404-05 (8th Cir. 2002); *Swoopes v. Sublett*, 196 F.3d 1008, 1009-10 (9th Cir. 1999).  I am not aware of any case from a United States Court of Appeals that reaches a contrary result.  I agree with and adopt the analyses in these cases, and I conclude that Rule 51.1 eliminates the need to seek discretionary review by the Colorado Supreme Court in order to satisfy the federal habeas corpus exhaustion requirement.

The respondents argue also that Rule 51.1 may not properly be applied retroactively to Cournoyer's case, eliminating the previous federal habeas requirement that Cournoyer present his federal constitutional claims to the Colorado Supreme Court before seeking federal habeas relief.  The respondents argue that Rule 51.1 should not be applied retroactively because: (1) to do so would not serve the purpose of the rule, which is, purportedly, to limit the number of petitions for certiorari presented to the Colorado Supreme Court and to avoid delay; and (2) the language of the rule is ambiguous concerning prospective versus retroactive application.

Under Colorado law, the retroactive application of a statute is determined by examining: (1) whether application of the law in the case at issue would be retroactive; (2) whether the legislature intended the statute to be retroactive; and (3) if the answers to the first two questions are affirmative, whether retroactive application of the statute otherwise would be permissible or impermissible.  *People v. Chavarria-Sanchez*, ___ P.3d ___, ___, 2009 WL 540624, *1 (Colo. App. 2009).  The propriety of retroactive application of a

statute "turns in part on whether any changes were substantive rather than only procedural or remedial." *Id*. at ___, *2 (internal quotations and citations omitted).   The Colorado Constitution provides that "[n]o ex post facto law, nor law . . . retrospective in its operation . . . shall be passed by the general assembly." Colo. Const. art. II, § 11.  This constitutional provision is not applicable in this case because Rule 51.1 is not a law passed by the Colorado General Assembly.  I conclude that the same analysis is appropriate to determine whether Rule 51.1 is applicable retroactively.

Both Cournoyer's direct appeal of his conviction and his appeal of the trial court's denial of post-conviction relief under Crim.P. 35(c) had been completed before Rule 51.1 became effective on May 18, 2006.  Thus, application of Rule 51.1 in this case would be retroactive.  *See, e.g., Ficarra v. Dept. of Regulatory Agencies*, 849 P.2d 6, 11 (Colo. 1993) (legislation acts retroactively when it operates on transactions that have already occurred or rights and obligations that existed before its effective date).

The text of Rule 51.1 indicates clearly that the Colorado Supreme Court intended for the rule to be applied retroactively.  The rule states explicitly that it applies to "all appeals from criminal convictions or post-conviction relief matters from or after July 1, 1974."  The respondents cite other phrases in the rule that are, according to the respondents, ambiguous on the issue of retroactivity.  Such arguably ambiguous phrases, considered with the specific phrase quoted above, do not undermine the conclusion that the rule explicitly contemplates that it will be applicable retroactively.  I know of no basis to conclude that retroactive application of this rule otherwise is legally impermissible.

Retroactive application of similar state rules has been considered by three federal courts of appeals.  In *Wenger v. Frank*, 266 F.3d 218 (3d Cir. 2001), the United States Court of Appeals for the Third Circuit concluded that a Pennsylvania Supreme Court rule

eliminating the need to seek discretionary review in that court in order to exhaust state remedies was not retroactive. *See id.* at 226. The Third Circuit based its conclusion on the prospective language of the Pennsylvania Supreme Court rule, a finding that the primary purpose of the Pennsylvania Supreme Court rule would not be served by retroactive application, and the Third Circuit's view that whether a particular remedy was or was not available is a question of objective historical fact that cannot be retroactively altered. *See id.* at 225-26.

In contrast to *Wenger*, two other circuit courts have held that rules in Tennessee and Missouri, both of which are similar to the Pennsylvania Supreme Court Rule at issue in *Wenger* and to Colo. App. R. 51.1, do apply retroactively. *See Adams v. Holland*, 330 F.3d 398, 405 (6th Cir. 2003); *Randolph v. Kemna*, 276 F.3d 401, 404 (8th Cir. 2002). In *Randolph*, the Eighth Circuit reasoned that the Missouri rule was retroactive because the rule purported to clarify existing law and did not change the law. *Randolph*, 276 F.3d at 404. In *Adams*, the Sixth Circuit concluded similarly that the Tennessee rule was retroactive because the rule merely clarified the existing law in Tennessee. *Adams*, 330 F.3d at 405. Significantly, the Tennessee rule at issue in *Adams* provided expressly that it was applicable "[i]n all appeals from criminal convictions or postconviction relief matters from and after July 1, 1967." *See id*. at 401.

I conclude that Rule 51.1 is most like the Tennessee rule at issue in *Adams*. Like the Tennessee rule, the plain language of Colo. App. R. 51.1 provides expressly that it applies to "all appeals from criminal convictions or postconviction relief matters from or after July 1, 1974." The Colorado Supreme Court has expressed a clear intent that the rule be retroactive. Further, there is no other basis to conclude that retroactive application of the rule legally is impermissible. Rule 51.1 is applicable to the present case. The fact

17

that retroactive application of Rule 51.1 in this case would not serve the purposes of limiting the number of petitions for certiorari presented to the Colorado Supreme Court and avoiding delay does not mandate that the rule not be applied retroactively.

Cournoyer presented Claim One to the Colorado Court of Appeals as a federal claim. Applying Colo. App. R. 51.1, this is sufficient to "give the [Colorado] courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, I conclude that Claim One has been exhausted.

## 2. Claim Two

Cournoyer presented the testimony of Clark, Neese, Ellingson, and Kramer at his Crim.P. 35(c) hearing, and the trial court denied relief. Cournoyer appealed the trial court's ruling to the Colorado Court of Appeals. In his opening brief, Cournoyer framed the issue as: "Whether a trial judge can properly deny a post-conviction motion in a murder case, where uncontradicted testimony establishes that the conviction was obtained through perjured testimony?" *Response* [#12], Appendix F (opening brief - appeal of Rule 35(c) ruling). In his argument on this issue, Cournoyer cited only Colorado case law. He did not cite the United States Constitution or any federal case law or otherwise contend that the trial court's denial of Crim.P. 35(c) relief was a violation of Cournoyer's federal constitutional rights. In its opinion denying Cournoyer's appeal, the Colorado Court of Appeals analyzed the issues solely under state law. *People v. Cournoyer*, No. 03CA1138 (Colo. App. Feb 17, 2005) (not selected for publication) (*Response* [#12], Appendix I).

Again, to satisfy the exhaustion requirement, the claim in question must be presented as a federal constitutional claim in the relevant state court proceedings.

*Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam).  "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  *Id*. at 366.  The fact that state claims asserted explicitly are similar to possible federal claims is not sufficient to satisfy the exhaustion requirement.  *Id*.

Cournoyer did not present his Claim Two to the Colorado Court of Appeals as a federal constitutional claim.  Claim Two, therefore, has not been exhausted.  As the respondent notes, Cournoyer cited two federal cases in his reply brief, responding to an argument made by the People.  *Response* [#12], Appendix H, pp. 16 - 17 (reply brief - appeal of Rule 35(c) ruling).  Colorado law does not recognize arguments raised for the first time in a reply brief.  *People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo. 1990).  These citations in Cournoyer's reply did not serve to present or preserve a federal constitutional claim to the Colorado Court of Appeals.

After the Colorado Court of Appeals denied relief in Cournoyer's appeal of the trial court's Crim.P. 35(c) ruling, Cournoyer filed a petition for writ of certiorari and a motion for limited remand with the Colorado Supreme Court.  Both the petition and the motion were denied.  At this point, there is no means by which Cournoyer could properly present Claim Two to the Colorado courts as a federal constitutional claim.  Cournoyer may not present in a Crim.P. 35(c) proceeding any issue that could have been presented in an appeal or post-conviction proceeding brought previously.  Crim.P. 35(c)(VI).  Thus, Claim Two has been procedurally defaulted.  Federal habeas review of Claim Two is barred absent a showing of cause and prejudice or fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### C.  Conclusion

Claim One has been exhausted and, thus, is subject to the normal standard of review applicable to claims under 28 U.S.C. § 2254.  Claim Two has not been exhausted and has been procedurally defaulted.  Therefore, Claim Two is a proper basis for habeas relief only if Cournoyer shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate(s) that failure to consider the claims will result in a fundamental miscarriage of justice."  ***Coleman v. Thompson***, 501 U.S. 722, 750 (1991).  Cournoyer does not attempt to demonstrate cause and prejudice, but he does refer to the fundamental miscarriage of justice standard.  Thus, I analyze Claim Two under the fundamental miscarriage of justice standard.

### VI. CLAIM ONE

### A.  Standard of Review

The provisions of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1966 (AEDPA), govern Cournoyer's petition.  Section 2254(d) establishes a standard of habeas review known as AEDPA deference.  ***See, e.g., Brown v. Uphoff***, 381 F.3d 1219, 1223 (10th Cir. 2004).  Under this standard, habeas corpus relief may not be granted on a claim adjudicated on the merits in state court proceedings unless the state court adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of

law, or if the state court decides a case differently on a set of materially indistinguishable facts. **Penry v. Johnson**, 532 U.S. 782, 792 - 93 (2001).  A habeas petitioner challenging a state court's ruling must show that the state court's decision was objectively unreasonable, not merely erroneous, incorrect, or contrary to what a federal court might decide on direct appeal.  **See Bell v. Cone**, 535 U.S. 685, 694 (2002); **Williams v. Taylor**, 529 U.S. 362, 410-11 (2000).  The applicable, clearly established law is based on "Supreme Court precedent as it existed when the state court reached its decision." **Brown**, 381 F.3d at 1224 n. 4.  The "clearly established" phrase of § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of (the Supreme) Court's decisions as of the time of the relevant state-court decision." **Williams**, 529 U.S. at 412.

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court.  **See Estelle v. McGuire**, 502 U.S. 62, 67-68 (1991); **Lewis v. Jeffers**, 497 U.S. 764, 780 (1990); **Pulley v. Harris**, 465 U.S. 37, 41 (1984).  "When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.' *Ibid.*  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*." **Coleman v. Thompson**, 501 U.S. 722, 730 (1991) (quoting 28 U.S.C. § 2254).  Factual findings made by the state courts are presumed correct, with the petitioner having the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); **Darks v. Mullin**, 327 F.3d 1001, 1007 (10th Cir. 2003).  "[W]hether a state court's decision was unreasonable must be assessed in light of the record [that court] had before it." **Holland v. Jackson**, 542 U.S. 649, 651-52 (2004) (*per curiam*) (citations omitted).

## B.  Analysis

Claim One concerns the trial court's denial of Cournoyer's motion for new trial to the

extent that motion was based on the testimony of Jimmy Russell.  Again, addressing

Russell's testimony, the trial court concluded that Russell's testimony,

> is not material to the issues involved and is more appropriately characterized
> as impeachment evidence.  At trial, Sullivan testified that the defendant was
> present and was armed during the robbery of the victim, Leo Hartnett.
> Sullivan offered little else in terms of defendant's criminal involvement in the
> commission of the offenses.  Given this context . . . the information is not
> offered as a fact of consequence, but as information to challenge the
> credibility of Sullivan.  As such, and given the credibility problems Russell
> would present with, this Court finds it extremely unlikely that a reasonable
> jury would acquit the defendant if evidence of Sullivan's alleged statements
> to Russell were presented at trial.

*Petition*, Exhibit B, p. 2 (trial court's May 4, 2000, order).

On habeas review, the factual findings made by state trial courts are presumed to

be correct, unless the petitioner rebuts this presumption by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); ***Darks v. Mullin***, 327 F.3d 1001, 1007 (10th Cir. 2003).  Of course,

credibility determinations often are the foundation of factual determinations.  Addressing

Cournoyer's motion for new trial and Russell's testimony, the trial court found that if

Russell would have testified at trial, he would have presented with significant credibility

problems.  The court noted Russell's several felony convictions and the fact that he did not

tell Cournoyer about Sullivan's statements to Russell until long after the statements

purportedly were made.  Given these credibility issues, the court found it "extremely

unlikely that a reasonable jury would acquit the defendant if evidence of Sullivan's alleged

statements to Russell were presented at trial."

Cournoyer has not come forward with any significant evidence or argument that

shows that the state court's determinations (1) resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  I conclude that the state court had ample basis in the record to support its conclusions concerning Russell's credibility and its conclusion that it is "extremely unlikely" Russell's testimony would change the jury's verdict.  Cournoyer has not demonstrated that the state court's denial of his motion for new trial was based on an unreasonable determination of the facts, in light of the evidence in the record, or that this decision was contrary to, or involved an unreasonable application of, clearly established federal law.  Thus, Cournoyer is not entitled to habeas relief on Claim One.

## VII.  CLAIM TWO

### A.  Standard of Review

Again, Claim Two was procedurally defaulted.  Therefore, Claim Two is a proper basis for habeas relief only if Cournoyer shows "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate(s) that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Cournoyer does not attempt to demonstrate cause and prejudice, but he does refer to the fundamental miscarriage of justice standard.  Thus, I analyze Claim Two under the fundamental miscarriage of justice standard.

Cournoyer argues that failure to hear his claims would result in a fundamental miscarriage of justice because he is actually innocent.  In this context, a claim of actual innocence "is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

> (T)he fundamental miscarriage of justice exception is an extremely narrow exception, implicated only in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent. To prevail, [a habeas applicant] must identify evidence that affirmatively demonstrates his innocence. A criminal defendant is required to provide evidence that does more than simply undermine the finding of guilt against him or her.

**Phillips v. Ferguson,** 182 F.3d 769, 774 (10th Cir. 1999) (quotations and citations omitted). Further, to fall within the fundamental miscarriage of justice exception, the petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." **Schlup v. Delo**, 513 U.S. 298, 327 (1995).

A habeas petitioner who seeks to demonstrate that he falls within the fundamental miscarriage of justice exception must "support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." **Schlup**, 513 U.S. at 324. Applying the standard established in **Schlup**, the newly presented evidence may call into question the credibility of witnesses presented at trial. **Schlup**, 513 U.S. at 330. In this circumstance, the habeas court may have to make some credibility assessments. Further, in determining whether to grant a hearing to a habeas petitioner seeking to meet the **Shlup** standard, the court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." **Id**. at 331 - 332. This may include consideration of "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." **Id**. The **Schlup** standard focuses on the likely behavior of reasonable jurors in light of the new evidence. **Id**. The fact that the record contains sufficient evidence to support a conviction is not determinative under **Schlup**. **Id**. at 869. Rather, the habeas court must determine if it is more likely than not that no reasonable juror would have convicted the petitioner in

light of the new evidence. *Id*. at 327.

## B.  Analysis

I conclude that the new evidence cited by Cournoyer does not affirmatively demonstrate Cournoyer's innocence.  Rather, the new evidence challenges the credibility of certain key witnesses who testified against Cournoyer.  Further, considering the trial evidence and the new evidence together, I conclude that Cournoyer has not demonstrated that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.  Absent such proof, habeas review of Cournoyer's procedurally defaulted Claim Two is barred.

As detailed above, Cournoyer's new evidence consists of the testimony of Clark, Neese, Ellingson, and Kramer.  Each of these witnesses testified, long after Cournoyer's trial was complete, that they had been told by Curren and/or Behymer that Cournoyer was not involved in the murders and that Behymer falsely implicated Cournoyer in Behymer's testimony at Cournoyer's trial.  As detailed by the trial court in its findings at the conclusion of Cournoyer's Rule 35(c) hearing, if this evidence had been presented at Cournoyer's trial, along with all of the other evidence that was presented at trial, reasonable jurors readily could conclude that the testimony of Clark, Neese, Ellingson, and Kramer was not credible.

Each of these witnesses potentially was biased because each testified that they were a friend of Cournoyer's and they cared about Cournoyer.  More important, "not a single one [of the four witnesses] came forward to help their friend . . . at a time when" it would be reasonable for a caring friend "to have come forward with what would have been fairly compelling evidence showing nonguilt . . . ."  *Response* [#12], Appendix G (answer brief - appeal of Rule 35(c) ruling), appendix to answer brief (transcript of trial court's ruling

on Rule 35(c) motion), pp. 107 - 108. Clark testified that one month before Cournoyer's trial, Curren told Clark that Cournoyer was not involved with the murders. Clark did not come forward with this crucial information at an obviously crucial time. Kramer testified that prior to Cournoyer's trial he overheard Curren and Behymer state that they were implicating Cournoyer even though Cournoyer was not involved with the murders. Kramer did not come forward with this crucial information at an obviously crucial time, purportedly because he, Kramer, was on probation. Neese testified that after Cournoyer had been convicted, Behymer told Neese that Cournoyer had nothing to do with the murders. Neese said he did not come forward with this information because he did not want to get involved. Ellingson testified that after Cournoyer had been convicted, Behymer told Ellingson that Cournoyer was not involved with the murders. Ellingson also did not come forward with this information.

Cournoyer argues that the trial court chose "to abuse his role as a fact-finder" when it denied Cournoyer's motion for a new trial after hearing the testimony of Clark, Neese, Ellingson, and Kramer. *Petition*, p. 19. Even if I apply the more lenient AEDEPA deference standard, discussed above in connection with Claim One, I cannot find that the trial court's determination that the testimony of Clark, Neese, Ellingson, and Kramer is not credible is a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Rather, the bases cited by the trial court for its credibility determinations are reasonable in light of the evidence presented to the trial court at the Crim.P. 35(c) hearing.

Applying the fundamental miscarriage of justice standard, I must examine Cournoyer's new evidence and the evidence presented at Cournoyer's trial to determine if it is more likely than not that no reasonable juror would have convicted Cournoyer in light

of the new evidence.   The key evidence presented at trial included the testimony of Kelly

Callaway, who said Cournoyer and Wood were standing in her kitchen armed with guns

when she left her house to go shopping on May 26, 1997, shortly before the murders took

place.  Callaway testified also that following the murders, Curren, Behymer, Wood, and

Cournoyer all contributed money for repairs to her house and told her that they would fix

everything.  Callaway testified further that all four men, including Cournoyer, returned to

Callaway's house the following day to finish cleaning the house.  Finally, Callaway testified

that Cournoyer told her that Cournoyer had struck Hartnett in the head with the butt of a

shotgun, and that he had "jumped on a guy's rib cage," bragging that his "feet were a lethal

weapon."  Combined with evidence that Palma and Hartnett had been murdered,

Callaway's testimony, if believed, provides substantial evidence in support of Cournoyer's

convictions.

Sullivan testified that he observed Cournoyer, Curren, and Wood in Callaway's

house and armed with shotguns when Sullivan arrived at the house with Hartnett, one of

the victims, on the day of the murders.  Sullivan testified also that he saw Curren,

Behymer, Wood, and Cournoyer, charge Hartnett and violently shove him against the wall

as Sullivan was leaving the house.  Sullivan testified further that Cournoyer helped to clean

Callaway's house after the murders, and that Cournoyer permitted the temporary storage

of the two corpses in a truck owned by Cournoyer.

Although Behymer's testimony is not detailed in the parties' briefs, Cournoyer

asserts that Behymer's testimony was consistent with that of Sullivan and Callaway

because Behymer implicated Cournoyer in the murders.  *Petition*, p. 13.

Finally, Kara Erickson testified that she was friends with Callaway and she knew

Sullivan, Curren, Behymer, Wood, and Cournoyer.  Nothing in the parties' briefs indicates

that Erickson was involved with the murders in any way.  Erickson said she went to Callaway's house for lunch, as she often did, on May 27, 1997, the day after the murders. Erickson testified that when she arrived at Callaway's house on May 27, 1997, she saw the large hole in one of the walls of Callaway's house.  Further, she testified that Cournoyer, Wood, Sullivan, and Curren all were at Callaway's house when she arrived.  Notably, Erickson's testimony ties Cournoyer to relevant events on the day following the murders and the new evidence does not serve to undermine Erickson's credibility.

Cournoyer argues that his new evidence, the testimony of Clark, Neese, Ellingson, and Kramer, so undermines the credibility of Callaway, Sullivan, and Behymer's trial testimony that the new evidence demonstrates that Cournoyer's conviction was based on perjured testimony by Callaway, Sullivan, and Behymer, and that Cournoyer actually is innocent.  I disagree.  The key issue at trial and in evaluating the new evidence is the credibility of the various witnesses.  The essence of Cournoyer's new evidence is statements by third parties indicating that Behymer made statements, both before and after Cournoyer's trial, that were inconsistent with Behymer's trial testimony implicating Cournoyer.  In addition, the new evidence indicates that Curren, who did not testify at trial, stated that Cournoyer was not involved with the murders.  If believed, the new evidence also serves to undermine the credibility of Callaway and Sullivan's trial testimony.

Considering the trial testimony and the testimony of Clark, Neese, Ellingson, and Kramer, a reasonable fact finder could reach a variety of conclusions.  Given such conflicting testimony, a fact finder must make credibility determinations if the fact finder is to choose to rely on a witness's statement in the face of conflicting testimony.  For example, considering all of this evidence together, a reasonable fact finder could reject the testimony of Clark, Neese, Ellingson, and/or Kramer as not credible, and accept the

testimony of Behymer, Sullivan, and/or Callaway.  As discussed above, there is ample

basis in the record to support a reasonable conclusion that the testimony of Clark, Neese,

Ellingson, and Kramer is not credible.  Stated differently, the testimony of Clark, Neese,

Ellingson, and Kramer does not make it unreasonable to accept the testimony of Behymer,

Sullivan, and/or Callaway.  Alternatively, a reasonable fact finder might reject the testimony

of Behymer, Sullivan, and/or Callaway, and accept that of Clark, Neese, Ellingson, and/or

Kramer.  This is the conclusion for which Cournoyer argues, but this conclusion is not the

only reasonable conclusion that can be drawn when considering the trial evidence and

Cournoyer's new evidence.  Considering all of the evidence together, the evidence in the

record does not mandate the conclusion that any one of these witnesses was credible or

not credible.

A reasonable fact finder could reject the testimony of Clark, Neese, Ellingson,

and/or Kramer, and I cannot conclude that it is more likely than not that no reasonable

juror would have convicted Cournoyer in light of the new evidence.  Rather, it readily is

conceivable that many reasonable jurors would convict Cournoyer when considering the

new evidence and the evidence presented at trial.  I conclude ultimately that Cournoyer

has not satisfied the fundamental miscarriage of justice exception defined in *Schlup v.*

*Delo*, 513 U.S. 298, 327 (1995), and related cases.  Therefore, Cournoyer's Claim Two is

barred.

## VIII.  CONCLUSION & ORDERS

Cournoyer exhausted his state remedies as to Claim One.  However, Cournoyer is

not entitled to habeas relief on Claim One because he has not demonstrated that the state

courts' adjudication of this claim resulted in either (1) a decision that was contrary to, or

involved an unreasonable application of, clearly established federal law, as determined by

the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the state court

proceeding.

Cournoyer did not exhaust his state remedies as to Claim Two, and Claim Two has

been procedurally defaulted.  Cournoyer may not seek habeas review of his procedurally

defaulted claim unless he demonstrates cause for the default and actual prejudice as a

result of the alleged violation of federal law, or that failure to consider the claim will result in

a fundamental miscarriage of justice.  Cournoyer does not seek to demonstrate cause and

prejudice. He does attempt to show that he falls within the fundamental miscarriage of

justice exception because he claims that new evidence demonstrates that he actually is

innocent.  To demonstrate actual innocence, for the purpose of the fundamental

miscarriage of justice exception, Cournoyer must show that it is more likely than not that

no reasonable juror would have convicted him in light of the new evidence.  Having

examined the evidence presented at trial as well as Cournoyer's new evidence, I cannot

conclude that it is more likely than not that no reasonable juror would have convicted

Cournoyer in light of the new evidence and the evidence presented at trial.  Accordingly,

Cournoyer is not entitled to habeas review of Claim Two.

THEREFORE, IT IS ORDERED as follows:

1. That the petitioner's **Petition for Writ of Habeas Corpus Pursuant To 28**

**U.S.C. § 2254** [#1] filed May 18, 2006, is **DENIED**; and

2.  That this case is **DISMISSED** with prejudice.

Dated May 26, 2009, at Denver, Colorado.

**BY THE COURT:**

Rob Blackburn

Robert E. Blackburn
United States District Judge